UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JASON L. SANDERS,

                  Plaintiff,

v.

HEIDI E. WASHINGTON et al.,

                  Defendants.

_____/

Case No. 1:21-cv-510

Honorable Robert J. Jonker

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under Rule 21 of the Federal Rules of Civil Procedure, the Court may at any time, with or without motion, add or drop a party for misjoinder or nonjoinder. Fed. R. Civ. P. 21. Applying Rule 21, the Court will drop Defendants Walzac, McBride, Battle, Stroller, Klien, Robinson, Bennikson, Harrison, Inspector Gibson, Officer Gibson, Burch, Crips, Simon, Muchowski, George, Parish, Unknown Party #1, Unknown Party #2, Strong, and Corning from this action and dismiss the claims against them without prejudice. The Court will also dismiss without prejudice as misjoined Plaintiff's claims against Defendant Macauley other than Plaintiff's claim that Defendant Macauley closed the law library.

Additionally, under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v.*

*Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying the PLRA to the remaining claims, the Court will dismiss Plaintiff's complaint because Plaintiff fails to state a claim.

The Court will also deny Plaintiff's pending motions.

## Discussion

### I.     Factual allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues MDOC Director Heidi E. Washington and the following IBC personnel: Warden Unknown Macauley; Deputy Wardens Unknown Walzac and Unknown McBride; Prisoner Counselors Unknown Battle and Unknown Stroller; Food Service Director Unknown Klien; Grievance Coordinator Unknown Robinson; Captain Unknown Bennikson; Lieutenant Unknown Harrison; Inspector Unknown Gibson; Corrections Officers Unknown Gibson,[1] Unknown Burch, Unknown Crips, Unknown Simon, Unknown Muchowski, Unknown George, and Unknown Parish; Healthcare Unit Manager Unknown Party #1; Healthcare Unit Supervisor Unknown Party #2; and Nurses Unknown Strong and C. Corning.

---

[1] Plaintiff has listed two Defendants with the name "Unknown Gibson." Although the complaint is not altogether clear, it appears that they are not one in the same person. One holds the title of "Inspector," while the other is a first shift corrections officer on Unit 7. For clarity, the Court will refer to them as "Inspector Gibson" and "Officer Gibson."

Plaintiff's complaint initially appears to resemble many others that have been brought in the Western District of Michigan by prisoners with legitimate fears posed by the ongoing COVID-19 pandemic and frustrations with their prisons' responses. But on closer inspection, that is different in important ways. This appears to be Plaintiff's fourth of seven complaints since August 2020 that he has brought against many of the same defendants.[2] Plaintiff has sued Defendant Washington in five of the seven actions, and he has sued Defendant Macauley in all seven. Plaintiff's amended complaint also duplicates allegations he has raised in prior and later actions. *See Sanders v. Washington*, No. 1:21-cv-1091, 2022 WL 247831, at *1, *5–7 (W.D. Mich. Jan. 27, 2022) (dismissing Plaintiff's complaint in that action as malicious and frivolous because his allegations duplicated claims, particularly against Defendants Washington and Macauley, that he brought in other complaints including in the instant action).

Plaintiff alleges in the instant amended complaint conduct from several discrete events at IBC, the first of which occurred by December 2020 and the last of which occurred after the start of April 2021. Some of the allegations appear to be utter nonsense. (*E.g.*, Am. Compl., ECF No. 12, PageID.325) ("IBC . . . fail[ed] to heed . . . Patriot Act Section (1802) . . . ."). The first and earliest allegation that reasonably can be construed as a claim alleges that Defendants Washington and Macauley interfered with Plaintiff's access to the courts by closing the IBC law library. From August to December 2020, IBC's Unit 3 served as a COVID-19 outbreak unit. In December 2020, "Plaintiff was forced to miss a court deadline due to [Defendants] Washington and Macauley[']s

---

[2] The recent opinion in *Sanders v. Washington*, No. 1:21-cv-1091, 2022 WL 247831, at *1–2, *5–7 (W.D. Mich. Jan 27, 2022), identifies Plaintiff's other cases and describes several in more detail.

3

closing [of] the law library." (*Id.*, PageID.327.) The remaining allegations have little clear connection to the first.

By the end of December 2020, after Plaintiff "attempted to grieve" issues related to COVID-19, Defendant Robinson threatened to place Plaintiff on modified access to the grievance process. (*Id.*, PageID.336.) Plaintiff explains that he contacted internal affairs and legal affairs to report IBC staff's failures to comply with Governor Whitmer's executive orders related to COVID-19. Plaintiff appears to allege that Defendant Robinson's conduct implicated Defendants Battle, Stroller, and Macauley as well.

In early February 2021, the B.1.1.7 variant of the novel coronavirus infected kitchen workers first in Unit 7, next in Unit 6, and finally in Unit 3, and "[Defendants] Washington and Macauley refused to shut down the IBC food service" dining hall. (*Id.*, PageID.327–328, 333). Around February 9, 2021, Defendants Macauley and Battle allegedly moved Plaintiff and inmate Steele (not a party), who worked in food service, to a new cell on Unit 7. The complaint does not clearly allege a timeline or describe when Plaintiff and inmate Steele first became cellmates, but at some point after February 9, inmate Steele tested positive for COVID-19. Plaintiff was then tested, and his results returned negative. After spending several more hours in the cell with Steele, Plaintiff was moved to a quarantine cell, apparently on another unit, for those prisoners who had been in close contact with individuals ill with COVID-19.

Plaintiff contends that he was restricted while quarantined. Defendants Battle and Stroller did not conduct rounds on his quarantine cell to process his legal mail. Plaintiff could not file medical complaints or grievances. He purportedly risked a misconduct charge if he stated that he had urgent or emergent health complaints. He was allowed to clean his cell only three times out of

the thirteen days he was quarantined. He further was "denied outside activity . . . for a certain amount of time . . . ." (*Id.*, PageID.329.) At an unspecified time, Plaintiff's cellmate in his quarantine cell tested positive for COVID-19. Plaintiff eventually tested positive on February 23, 2021, and he subsequently moved into a cell on Unit 7.

While Plaintiff was housed on Unit 7, which presumably became the COVID-19 unit, he continued to face restrictions. He and other Unit 7 prisoners were "locked down 23 hours a day" and purportedly at Defendant Washington's direction, could "only receive food and showers." (*Id.*, PageID.330.) Plaintiff complains that Unit 7 prisoners "were denied exercise yard" and given only "8 minute[s]" for phone calls and "5 minute[s]" of J-Pay daily. (*Id.*) Plaintiff further alleges that Defendants Washington, Macauley, and Walzac "mix[ed]" the population in Unit 7, housing both Security Level 4 and Security Level 2 prisoners, "which created a hostile and unsafe environment for the lower custody prisoners." (*Id.*) Neither administrative nor custodial staff at IBC conducted rounds on the COVID-19 unit.

Plaintiff further alleges that medical staff did not adequately treat him while he was ill with COVID-19. He alleges that MDOC does not have any ventilators. On March 16, 2021, Defendant Unknown Party #2 purportedly "ordered nursing staff to stop providing [Plaintiff] with COVID-19 related check-ups . . . ." (*Id.*, PageID.331.) From March 18 to March 26, 2021, Plaintiff allegedly complained about his breathing to at least six Defendants and requested to be seen by healthcare. Staff took Plaintiff to a hospital on March 26, 2021, in response to Plaintiff's requests. At some point in March, after Plaintiff complained about Defendants Strong and Muchowski, Defendant Simon purportedly "vandalized . . . [P]laintiff[']s legal property . . . ." (*Id.*, PageID.332.)

Defendant Simon allegedly told Plaintiff, "[n]ext time you'll think twice before filing gr[ie]vances or complaints on our officers." (*Id.*)

The remainder of Plaintiff's allegations apply more generally to the pandemic. He argues that Defendant Washington "failed to create available space . . . [for] prisoners who tested positive for COVID-19 . . . ." (*Id.*) He further contends that he lacked the ability to socially distance at IBC. Plaintiff asserts that Defendant Washington "failed to order mandatory staff testing" for COVID-19. (*Id.*) Plaintiff complains about the sewer system, ventilation, and windows at IBC, stating that they were not cleaned sufficiently frequently. He alleges that food trays and pans were allowed to sit out in the dining hall. Plaintiff asserts that the dining hall was not sanitized or fumigated. He asserts that when prison cell windows are opened, air from the prison enters the cell, which he argues was "a motivating factor for the COVID-19 outbreak at IBC." (*Id.*, PageID.334.) Summarizing his allegations, Plaintiff contends that IBC staff "did not take proper precautions" to prevent Plaintiff from contracting COVID-19. (*Id.*, PageID.333.) He avers that social distancing in IBC was impossible.

Also mixed within Plaintiff's amended complaint is an incomplete declaration. (*Id.*, PageID.335.) It appears that Plaintiff wrote the declaration himself and left the name and signature of the declarant open. It remains unsigned.

Finally, Plaintiff lists what he styles as fifteen "legal claims" for relief. Many of the claims each assert multiple rights to relief related to Plaintiff's allegations.

Plaintiff seeks declaratory relief, $100,000 in compensatory damages against each Defendant, $100,000 in punitive damages against each Defendant, and costs.

6

## II.     Pending motions

Plaintiff also has motions pending before the Court. He has filed an unsigned motion to amend the complaint (ECF No. 10), two motions to certify a class (ECF Nos. 14, 17), and a motion to appoint counsel (ECF No. 18).

### A.     Motion to amend the complaint

Plaintiff's motion to amend the complaint (ECF No. 10) arrived several days before Plaintiff's amended complaint (ECF No. 12). Both filings appear to have been mailed on the same day, and the amended complaint serves as the operative pleading.

Rule 11 of the Federal Rules of Civil Procedure requires that "[e]very pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name— or by a party personally if the party is unrepresented." Fed. R. Civ. P. 11(a). Plaintiff is unrepresented and has not signed the motion. On July 8, 2021, the Court informed Plaintiff that it would strike the motion from the record without further order if Plaintiff did not submit his signature within 21 days. (ECF No. 11.) Plaintiff did not submit his signature within 21 days.

### B.     Motions to certify class and to amend

Plaintiff has also filed a motion seeking class certification (ECF No. 14). He has further filed a motion to amend (ECF No. 17) stating that he intends to state to the Court the number of putative class members, however, he omitted any such number.

The purposes of class action suits are judicial economy and the opportunity to bring claims that would not be brought absent the class action because it might not be economically feasible to bring them as individual claims. *See Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 650 (6th Cir. 2006). Federal Rule of Civil Procedure 23, which governs class certification, provides that:

> One or more members of a class may sue . . . as representative parties on behalf of all only if (1) the class is so numerous that joinder . . . is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The four prerequisites for class certification are respectively referred to as "numerosity, commonality, typicality, and adequacy of representation." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010); *see also Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006).

Thus, for a case to proceed as a class action, the Court must be satisfied on the grounds enumerated above, including the adequacy of class representation. *See* Fed. R. Civ. P. 23(a)(4). Plaintiff bears the burden of establishing the right to class certification. *See In re Am. Med. Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996).

It is well established that *pro se* litigants are "inadequate class representatives." *Garrison v. Mich. Dep't of Corr.*, 333 F. App'x 914, 919 (6th Cir. 2009) (citations omitted); *Ziegler v. Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003) (recognizing that "[g]enerally pro se prisoners cannot adequately represent a class" (citing *Fymbo v. State Farm & Cas. Co.*, 213 F.3d 1320, 1321 (10th Cir. 2000))); *Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008) (recognizing that "[p]*ro se* prisoners generally may not bring class action lawsuits concerning prison conditions" (citing *Dean v. Blanchard*, 865 F.2d 257 (6th Cir. 1988) (table); *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975))); *Palasty v. Hawk*, 15 F. App'x 197, 200 (6th Cir. 2001) (concluding that "pro se prisoners are not able to represent fairly [a] class" (citing *Fymbo*, 213 F.3d at 1321; *Oxendine*, 509 F.2d at 1407)); *Marr v. Michigan*, No. 95-1794, 1996 WL 205582, at *1 (6th Cir. Apr. 25, 1996) (noting that "an imprisoned litigant who is not represented by counsel may not represent a class of inmates because the prisoner cannot adequately represent the interests of the

class" (citing *Oxendine*, 509 F.2d at 1407)). Because Plaintiff is an incarcerated *pro se* litigant, the Court finds that he is not an appropriate representative of a class. Therefore, the Court will deny Plaintiff's request for class certification.

### C.      Motion to appoint counsel

Plaintiff has also asked the Court to appoint counsel. (ECF No. 10.) Indigent parties in civil cases have no constitutional right to a court-appointed attorney. *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993). The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604–05; *see Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances. In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel. *See Lavado*, 992 F.2d at 606. The Court has carefully considered these factors and determines that, at this stage of the case, the assistance of counsel does not appear necessary to the proper presentation of Plaintiff's position. Plaintiff's motion will be denied.

## III.   Misjoinder

Plaintiff brings this action against twenty-two Defendants, alleging discrete events that occurred over approximately four months, with at least fifteen "claims."

### A.      Improper joinder

Federal Rule of Civil Procedure 20(a) limits the joinder of parties in a single lawsuit, whereas Federal Rule of Civil Procedure 18(a) limits the joinder of claims. Rule 20(a)(2) governs when multiple defendants may be joined in one action:

> [p]ersons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2). Rule 18(a) states: "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a).

Courts have recognized that, where multiple parties are named, as in this case, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action. It is not concerned with joinder of claims, which is governed by Rule 18. Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18. . . .

> Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all.

7 Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1655 (3d ed. 2001), *quoted in Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009), *and Garcia v. Munoz*, No. 08-1648, 2008 WL 2064476, at *3 (D.N.J. May 14, 2008); *see also United States v. Mississippi*, 380 U.S. 128, 142–43 (1965) (joinder of defendants is permitted by Rule 20 if both commonality and same transaction requirements are satisfied).

Therefore, "a civil plaintiff may not name more than one defendant in his original or amended complaint unless *one* claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact." *Proctor*, 661 F. Supp. 2d at 778 (emphasis added) (internal quotation marks omitted). When determining if civil rights claims arise from the same transaction or occurrence, a court may consider a variety of factors, including, "the time period during which the alleged acts occurred; whether the acts . . . are related; whether more than one act . . . is alleged; whether the same supervisors were involved,

10

and whether the defendants were at different geographical locations." *Id.* (quoting *Nali v. Mich. Dep't of Corr.*, No. 07-10831, 2007 WL 4465247, at *3 (E.D. Mich. Dec. 18, 2007)).

Permitting improper joinder of parties or claims in a prisoner civil rights action also undermines the purpose of the PLRA, which was to reduce the large number of frivolous prisoner lawsuits that were being filed in the federal courts. *See Riley v. Kurtz*, 361 F.3d 906, 917 (6th Cir. 2004). Under the PLRA, a prisoner may not commence an action without prepayment of the filing fee in some form. *See* 28 U.S.C. § 1915(b)(1). These "new fee provisions of the PLRA were designed to deter frivolous prisoner litigation . . . 'by making all prisoner [litigants] . . . feel the deterrent effect created by liability for filing fees.'" *Williams v. Roberts*, 116 F.3d 1126, 1127–28 (5th Cir. 1997) (quoting *Jackson v. Stinnett*, 102 F.3d 132, 136–37 (5th Cir. 1996)). The PLRA also contains a "three-strikes" provision requiring the collection of the entire filing fee after the dismissal for frivolousness, etc., of three actions or appeals brought by a prisoner proceeding in forma pauperis, unless the statutory exception is satisfied. 28 U.S.C. § 1915(g). The "three strikes" provision was also an attempt by Congress to curb frivolous prisoner litigation. *See Wilson v. Yaklich*, 148 F.3d 596, 603 (6th Cir. 1998).

The Seventh Circuit has explained that a prisoner like Plaintiff may not join in one complaint all of the defendants against whom he may have a claim, unless the prisoner satisfies the dual requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produce[s] but also to ensure that prisoners pay the required filing fees—for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g) . . . .
>
> A buckshot complaint that would be rejected if filed by a free person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D

failed to pay a debt, and E infringed his copyright, all in different transactions—
should be rejected if filed by a prisoner.

*George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *see also Brown v. Blaine*, 185 F. App'x 166,

168–69 (3d Cir. 2006) (allowing an inmate to assert unrelated claims against new defendants based

on actions taken after the filing of his original complaint would have defeated the purpose of the

three strikes provision of PLRA); *Patton v. Jefferson Corr. Ctr.*, 136 F.3d 458, 464 (5th Cir. 1998)

(declining to allow "litigious prisoners to immunize frivolous lawsuits from the 'three strikes'

barrier by the simple expedient of pleading unexhausted habeas claims as components of § 1983

suits"); *Shephard v. Edwards*, No. C2-01-563, 2001 WL 1681145, at *1 (S.D. Ohio Aug. 30, 2001)

(declining to consolidate prisoner's unrelated various actions so as to allow him to pay one filing

fee, because it "would improperly circumvent the express language and clear intent of the 'three

strikes' provision"); *Scott v. Kelly*, 107 F. Supp. 2d 706, 711 (E.D. Va. 2000) (denying prisoner's

request to add new, unrelated claims to an ongoing civil rights action as an improper attempt to

circumvent the PLRA's filing fee requirements and an attempt to escape the possibility of

obtaining a "strike" under the "three strikes" rule).

Under these circumstances, to allow Plaintiff to proceed with improperly joined claims and

Defendants in a single action would permit him to circumvent the PLRA's filing fee provisions

and allow him to avoid having to incur a "strike" for purposes of § 1915(g), should any of his

putative claims turn out to be frivolous, malicious, or fail to state a claim. Courts are therefore

obligated to reject misjoined complaints like Plaintiff's. *See Owens v. Hinsley*, 635 F.3d 950, 952

(7th Cir. 2011).

The Court will look to the first named Defendant and the earliest clear factual allegations involving that Defendant to determine which portions of the action should be considered related.[3] Plaintiff names Defendant Washington as the first Defendant in the caption of the amended complaint (Am. Compl., ECF No. 12, PageID.317), in the list of Defendants (*id.*, PageID.318), and in his allegations giving rise to a putative claim (*id.*, PageID.327). As noted above, Plaintiff's first and earliest allegations that reasonably give rise to a claim assert that Defendants Washington and Macauley closed IBC's law library, and Plaintiff purportedly missed a court deadline as a result.

The conduct by Defendants Walzac, McBride, Battle, Stroller, Klien, Robinson, Bennikson, Harrison, Inspector Gibson, Officer Gibson, Burch, Crips, Simon, Muchowski, George, Parish, Unknown Party #1, Unknown Party #2, Strong, and Corning is wholly unrelated to Plaintiff's putative claim regarding IBC's closed law library. Moreover, there is neither a transaction or occurrence, *see* Fed. R. Civ. P. 20(a)(2)(A), nor a question of law or fact, *see* Fed. R. Civ. P. 20(a)(2)(B), that is common to all Defendants. Plaintiff has, therefore, improperly joined to this action Defendants Walzac, McBride, Battle, Stroller, Klien, Robinson, Bennikson, Harrison, Inspector Gibson, Officer Gibson, Burch, Crips, Simon, Muchowski, George, Parish, Unknown Party #1, Unknown Party #2, Strong, and Corning as well as the claims against Defendant Macauley other than Plaintiff's claim that Macauley closed the law library**.**

---

[3] The analysis of joinder must start somewhere. The first-named Defendant is also referenced in the first factual allegations in the complaint involving any Defendant. Therefore, by accepting the first-named Defendant and first factual allegations giving rise to a putative claim as the foundation for this joinder analysis, the Court is considering the issue of joinder of Defendants as Plaintiff has presented it in his complaint.

### B.      Remedy

Because the Court has concluded that Plaintiff has improperly joined to this action multiple Defendants and the claims against them, the Court must determine an appropriate remedy. Under Rule 21 of the Federal Rules of Civil Procedure, "[m]isjoinder of parties is not a ground for dismissing an action." Fed. R. Civ. P. 21. Instead, Rule 21 provides two remedial options: (1) misjoined parties may be dropped on such terms as are just; or (2) any claims against misjoined parties may be severed and proceeded with separately. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572–73 (2004) ("By now, 'it is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time . . . .'" (*quoting Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989))); *DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006); *Carney v. Treadeau*, No. 2:07-cv-83, 2008 WL 485204, at *2 (W.D. Mich. Feb. 19, 2008); *Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F. Supp. 2d 924, 940 (E.D. Mich. 2008); *see also Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) ("[D]ismissal of claims against misjoined parties is appropriate."). "Because a district court's decision to remedy misjoinder by dropping and dismissing a party, rather than severing the relevant claim, may have important and potentially adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss under Rule 21 is restricted to what is 'just.'" *DirecTV*, 467 F.3d at 845.

At least three judicial circuits have interpreted "on such terms as are just" to mean without "gratuitous harm to the parties." *Strandlund v. Hawley*, 532 F.3d 741, 745 (8th Cir. 2008) (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)); *see also DirecTV*, 467 F.3d at 845. Such gratuitous harm exists if the dismissed parties lose the ability to prosecute an otherwise timely claim, such as where the applicable statute of limitations has lapsed, or the dismissal is with prejudice. *Strandlund*, 532 F.3d at 746; *DirecTV*, 467 F.3d at 846–47.

14

In this case, Plaintiff brings causes of action under 42 U.S.C. § 1983. For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years. *See* Mich. Comp. Laws § 600.5805(10); *Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999). The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The statute of limitations, however, is subject to tolling. The Sixth Circuit has recognized that, in prisoner civil rights actions, the statute of limitations is tolled for the period during which a plaintiff's available state administrative remedies were being exhausted. *See Brown v. Morgan*, 209 F.3d 595, 596–97 (6th Cir. 2000).

> The Prison Litigation Reform Act amended 42 U.S.C. § 1997e to provide: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (1999) . . . . This language unambiguously requires exhaustion as a mandatory threshold requirement in prison litigation. Prisoners are therefore prevented from bringing suit in federal court for the period of time required to exhaust "such administrative remedies as are available." For this reason, the statute of limitations which applied to Brown's civil rights action was tolled for the period during which his available state remedies were being exhausted.

*Id.* at 596 (citing *Harris v. Hegmann*, 198 F.3d 153, 157–59 (5th Cir. 1999) (per curiam), and *Cooper v. Nielson*, 194 F.3d 1316, 1999 WL 719514 (9th Cir. 1999)). The Sixth Circuit noted that because it could not determine when the period of exhaustion expired, the appropriate remedy was to remand the case to the District Court to "consider and decide the period during which the statute of limitations was tolled and for such other proceedings as may be necessary." *Id.* at 597. Furthermore, "Michigan law provides for tolling of the limitations period while an earlier action was pending which was later dismissed without prejudice." *Kalasho v. City of Eastpointe*, 66 F. App'x 610, 611 (6th Cir. 2003).

15

Plaintiff alleges that Defendants Walzac, McBride, Battle, Stroller, Klien, Robinson, Bennikson, Harrison, Inspector Gibson, Officer Gibson, Burch, Crips, Simon, Muchowski, George, Parish, Unknown Party #1, Unknown Party #2, Strong, Corning, and Macauley engaged in conduct no earlier than 2020. Whether or not Plaintiff receives the benefit of tolling during the administrative exhaustion period, *see Brown*, 209 F.3d at 596, and during the pendency of this action, *Kalasho*, 66 F. App'x at 611, Plaintiff has sufficient time in the limitations period to file new complaints against Defendants Walzac, McBride, Battle, Stroller, Klien, Robinson, Bennikson, Harrison, Inspector Gibson, Officer Gibson, Burch, Crips, Simon, Muchowski, George, Parish, Unknown Party #1, Unknown Party #2, Strong, Corning, and Macauley, and he will not suffer gratuitous harm if claims against these Defendants are dismissed.

Accordingly, the Court will exercise its discretion under Rule 21 and drop Defendants Walzac, McBride, Battle, Stroller, Klien, Robinson, Bennikson, Harrison, Inspector Gibson, Officer Gibson, Burch, Crips, Simon, Muchowski, George, Parish, Unknown Party #1, Unknown Party #2, Strong, and Corning from this suit, dismissing Plaintiff's claims against them without prejudice to the institution of new, separate lawsuits. *See Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997) ("In such a case, the court can generally dismiss all but the first named plaintiff without prejudice to the institution of new, separate lawsuits by the dropped plaintiffs"); *Carney*, 2008 WL 485204, at *3 (same). The Court will further dismiss without prejudice the misjoined claims against Defendant Macauley. If Plaintiff wishes to proceed with his claims against the dismissed Defendants, he shall do so by filing new civil actions on the form provided by this Court,

16

*see* W.D. Mich. LCivR 5.6(a), and paying the required filing fee or applying in the manner required by law to proceed *in forma pauperis*.[4]

## IV. Failure To State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

---

[4] As fully discussed in this opinion, Plaintiff is cautioned that he must limit all future actions to Defendants and claims that are transactionally related to one another. The Court may, in its discretion and without further warning, dismiss any future complaint, or part thereof, filed by Plaintiff that contains claims that are misjoined.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiff alleges several constitutional violations. He alleges that Defendants Washington and Macauley interfered with his access to the courts. He further alleges that Defendant Washington violated his Eighth Amendment rights. Plaintiff also asserts that Defendant Washington retaliated against him in violation of his First Amendment rights.

## A.    Access to the courts

Plaintiff avers that Defendants Washington and Macauley closed IBC's law library, which allegedly caused him to miss a court deadline. He argues that his right of access to the courts has been infringed in violation of the First and Fourteenth Amendments.

It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817. The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824–25. The right of access to the courts also prohibits prison officials from erecting barriers that may impede the inmate's access to the courts. *See Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992).

An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit. In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000. In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351–53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). The Supreme Court has strictly limited the types of cases for which there may be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355. "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (en banc). Moreover, the underlying action must have asserted a non-frivolous claim. *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (*Lewis* changed actual injury to include requirement that action be non-frivolous).

In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 415.

19

Plaintiff utterly fails to demonstrate that he suffered an actual injury as defined by *Lewis* and *Thaddeus-X*. Plaintiff neither alleges the basis for his underlying action nor indicates that he sought to attack his sentence or challenge the conditions of confinement. Further, it is not at all clear what, if any, remedy was lost to him. Consequently, *Christopher* instructs that his claim must be dismissed. *See* 536 U.S. at 415 ("[T]he underlying cause of action . . . is an element that must be described in the complaint . . . ."). The Court will therefore dismiss his access to the courts claim.[5]

## B.  Eighth Amendment

Plaintiff alleges that Defendant Washington, through policies and conduct, violated his Eighth Amendment rights.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148

---

[5] This is not Plaintiff's first attempt to bring a claim in the Western District of Michigan that Defendants Washington and Macauley infringed on his access to the courts. Indeed, Plaintiff previously challenged Defendants Washington's and Macauley's roles in closing the IBC law library in the fall of 2020 during the COVID-19 pandemic. *See Sanders v. Washington*, No. 1:21-cv-54, 2021 WL 1049876, at *3–4 (W.D. Mich. Mar. 19, 2021). In that action, Plaintiff suggested that Defendants Washington and Macauley impaired his ability to seek judicial review of a prison misconduct conviction. That court dismissed the claim because "a petition for judicial review of a misconduct conviction is not an attack on the prisoner's conviction or sentence; nor is it a challenge to the conditions of confinement." *Id.* at *4. Importantly, the opinion explained (1) that a plaintiff must address in his allegations the underlying cause of action and the remedy lost by a defendant's conduct and (2) what qualifies as an "actual injury" for an access-to-the-courts claim.

F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Plaintiff contends that Defendant Washington violated his Eighth Amendment rights under three different theories. First, Plaintiff asserts that Defendant Washington created MDOC policies that restricted privileges for prisoners quarantining or positive with COVID-19 and therefore constituted cruel and unusual punishment. Second, Plaintiff argues that Defendant Washington exposed him to higher security level prisoners in violation of the Eighth Amendment. Finally, Plaintiff contends that Defendant Washington was deliberately indifferent to the risk posed to him by the COVID-19 pandemic.

### 1.      Phone, J-Pay, and exercise yard privileges

Plaintiff contends that Defendant Washington created policies that restricted quarantining and COVID-positive prisoners from exercising in the prison yard, and the policies further limited daily phone time to eight minutes and J-Pay time to five minutes. (Am. Compl., ECF No. 12, PageID.330, 339.) He alleges that those policies constitute cruel and unusual punishment. To the extent that Plaintiff claims that Defendant Washington's policies limiting phone, J-Pay, and exercise yard privileges for prisoners quarantined or ill with COVID-19 violated the Eighth Amendment, his claim utterly lacks merit.

"Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.* Restrictions that are "restrictive or even harsh," but are not cruel and unusual under

21

contemporary standards, are not unconstitutional. *Rhodes*, 452 U.S. at 347. "To move beyond the pleading stage . . . , an inmate must allege that he has been deprived 'of the minimal civilized measure of life's necessities.'" *Harden-Bey v. Rutter*, 524 F.3d 789 (6th Cir. 2008) (quoting *Rhodes*, 452 U.S. at 347).

Neither MDOC policies that restricted Plaintiff to eight minutes a day of phone time and five minutes a day of J-Pay nor MDOC policies that temporarily denied time outdoors on the yard deprived Plaintiff of the minimal civilized measure of life's necessities. The Sixth Circuit has upheld dismissals of more severe restrictions to a prisoner's phone access. *See, e.g.*, *Allen v. Alexsander*, No. 19-1315, 2019 WL 4667707, at *2 (6th Cir. Sept. 12, 2019) (upholding the dismissal of an Eighth Amendment claim involving a 90-day complete denial of phone privileges). Plaintiff alleges that he was permitted at least some use of the phone and J-Pay each day. Consequently, Defendant Washington's policies limiting phone and J-Pay use during the COVID-19 pandemic do not constitute cruel and unusual punishment under the Eighth Amendment.

Likewise, Plaintiff's allegations that he was temporarily denied yard time also fail to state an Eighth Amendment claim. Plaintiff suggests that he was on a quarantine unit for approximately two weeks and on a COVID-19 unit while ill for several more weeks. "[T]otal or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees." *Rodgers v. Jabe*, 43 F.3d 1082, 1086 (6th Cir. 1995) (quoting *Patterson v. Mintzes*, 717 F.2d 284, 289 (6th Cir. 1983)); *see also Argue v. Hofmeyer*, 80 F. App'x 427 (6th Cir. 2003). Here, Defendant Washington's policies appear reasonable in trying to limit the continued spread of COVID-19 within the prison. For this reason, the policy appears to have a penological justification. But Plaintiff's claim fails for other reasons. It is well established that allegations about temporary inconveniences do not demonstrate that the conditions fell beneath

the minimal civilized measure of life's necessities as measured by a contemporary standard of decency. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *see also J.P. v. Taft*, 439 F. Supp. 2d 793, 811 (S.D. Ohio 2006). Plaintiff's inability to use the prison yard for a few weeks in February and March 2020 alleges nothing more than a temporary inconvenience. Moreover, Plaintiff does not allege that his cells were too small to permit any exercise or that he suffered any ill effects from the temporary limitation on his yard privileges. *See, e.g.*, *May v. Baldwin*, 109 F.3d 557, 565–66 (9th Cir. 1997) (holding that denial of out-of-cell exercise for 21 days did not rise to Eighth Amendment violation); *Knight v. Armontrout*, 878 F.2d 1093, 1096 (8th Cir. 1989) ("Denial of recreation for a short period, per se, is not a constitutional violation."); *Davenport v. DeRobertis*, 844 F.2d 1310 (8th Cir. 1988) (upholding a 90-day segregation threshold before five hours of weekly out-of-cell exercise is required), *cited with approval in Pearson v. Ramos*, 237 F.3d 881, 884–85 (7th Cir. 2001); *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (holding that there was no Eighth Amendment violation when the plaintiff was held in segregation without outdoor exercise for 28 days).

Thus, for all the reasons discussed above, Plaintiff fails to state an Eighth Amendment claim for policies that restricted access to phones, J-Pay, and the prison yard.

### 2. Sharing unit with security level 4 prisoners

Plaintiff's next Eighth Amendment claim asserts that he was placed in a "hostile and unsafe environment" because Defendant Washington permitted the COVID-19 outbreak unit to house both Security Level 4 and Security Level 2 prisoners. To be sure, Defendant Washington's COVID-19 policies permitted outbreak units with prisoners from mixed security levels. *See* COVID-19 Director's Office Memorandum (DOM) 2021-26R3, at 2. However, Plaintiff has shown neither that Defendant Washington's policies subjected him to "unnecessary and wanton infliction of pain," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), nor that her policies exposed him

to conditions below "contemporary standards of decency," *Hudson*, 503 U.S. at 8. Consequently, Plaintiff fails to state an Eighth Amendment claim against Defendant Washington for the policy that permitted mixing prisoners from different security levels on a COVID-19 outbreak unit. *C.f. Morris v. Metrish*, No. 97-1624, 1998 WL 246454, at *2 (6th Cir. May 5, 1998); *Cash v. Reno*, No. 97-5220, 1997 WL 809982, at *1 (6th Cir. Dec. 23, 1997).

### 3.     Risks of COVID-19

Plaintiff also alleges that he was incarcerated under conditions that put him at risk of contracting COVID-19. Reading Plaintiff's complaint with all due liberality, *see Haines*, 404 U.S. at 520, Plaintiff argues that Defendant Washington failed generally to prevent an outbreak of COVID-19 at IBC because she did not order mandatory testing for all IBC staff before entering the facility (Am. Compl., ECF No. 12, PageID.332) and "refused to shut down the IBC food service" dining hall (*id.*, PageID.333). Plaintiff further asserts that Defendant Washington "ap[p]ro[]ved . . . placement of positive COVID-19 inmates in cells with inmates . . . who tested negative for COVID-19 . . . ." (*Id.*, PageID.337.) Plaintiff also contends that Defendant Washington "placed [P]laintiff and [COVID-positive] prisoners in quarantine cells that housed 2 prisoners making it impossible to social[ly] distance . . . ." (*Id.*)

In order for a prisoner to prevail on an Eighth Amendment deliberate indifference claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that

he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### a.    Objective prong

In a 2020 case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death.  The BOP acknowledges that "[t]he health risks posed by COVID-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

The Sixth Circuit has determined that a plaintiff may satisfy the objective prong by alleging conditions that could facilitate COVID-19 transmission within a prison and the health risks posed by the virus. Plaintiff alleges conditions that facilitated COVID-19 transmission within the prison. The Court therefore concludes that at this stage in the proceedings, Plaintiff alleges facts sufficient to satisfy the objective prong of the deliberate indifference test.

### b.      Subjective prong

Notwithstanding Plaintiff's ability to satisfy the objective prong, he fails to allege facts

sufficient to satisfy the subjective prong of the deliberate indifference test in any of his claims.

The Sixth Circuit went on in *Wilson* to address the subjective prong of an Eighth

Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated

deliberate indifference to the serious risk of harm posed by COVID-19 in the prison.

> There is no question that the BOP was aware of and understood the potential risk
> of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As
> of April 22, fifty-nine inmates and forty-six staff members tested positive for
> COVID-19, and six inmates had died. "We may infer the existence of this
> subjective state of mind from the fact that the risk of harm is obvious." *Hope v.
> Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-
> 19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading
> at Elkton.
>
> The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*,
> 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates
> from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br.,
> PageID 42. These actions include
>
> > implement[ing] measures to screen inmates  for the virus; isolat[ing] and
> > quarantin[ing] inmates who may have contracted the virus; limit[ing]
> > inmates' movement from their residential areas and otherwise limit[ing]
> > group gatherings; conduct[ing] testing in accordance with CDC guidance;
> > limit[ing] staff and visitors and subject[ing] them to enhanced screening;
> > clean[ing] common areas and giv[ing] inmates disinfectant to clean their
> > cells; provid[ing] inmates continuous access to sinks, water, and soap;
> > educat[ing] staff and inmates about ways to avoid contracting and
> > transmitting the virus; and provid[ing] masks to inmates and various other
> > personal protective equipment to staff.
>
> *Id.* at 42–43.
>
> The BOP argues that these actions show it has responded reasonably to the risk
> posed by COVID-19 and that the conditions at Elkton cannot be found to violate
> the Eighth Amendment. We agree.
>
> Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is]
> not averted," the BOP has "responded reasonably to the risk" and therefore has not
> been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*,
> 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk

of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id.* at 840–41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread, to be reasonable. *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018)). The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081,] 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id.* at 1088–90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.

Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam),] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03. In *Marlow*e, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2–3.

*Wilson*, 961 F.3d at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions, not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard,* 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims. The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19 at the jail. The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended

28

to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days." *Id.* at 394. However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs. *Id.* at 395. Subsequently, in an unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction. *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

### (1)    General COVID-19 risks

In the instant case, Plaintiff claims that Defendant Washington's handling of the COVID-19 crisis at IBC violated his Eighth Amendment rights. The Court notes that the MDOC issued its first COVID-19 DOM on April 8, 2020, and issued multiple revised DOMs on the subject to limit the threat posed by COVID-19.[6] *See* MDOC DOM 2020-30 (eff. Apr. 8, 2020) (mandating multiple protective measures including the wearing of masks by prisoners and staff, screening of all individuals before entering prison facilities, keeping of social distance, restricting visits and phone calls, and limiting transfers and cell moves); DOM 2020-30R2 (eff. May 26, 2020)

---

[6] The Court takes judicial notice of these facts under Rule 201 of the Federal Rules of Evidence. The accuracy of the source regarding this specific information "cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also* Paul F. Rothstein, *Federal Rules of Evidence* 49 (3d ed. 2019) (citing *Matthews v. NFL Mgmt. Council*, 688 F.3d 1107 (9th Cir. 2012) (taking judicial notice of statistics on the NFL website that the plaintiff played 13 games in California over 19 years); *Victaulic Co. v. Tieman*, 499 F.3d 227, 236–37 (3d. Cir. 2007), as amended (Nov. 20, 2007) (finding error where a district court took judicial notice of facts stated in "a party's . . . marketing material" on an "unauthenticated" website because marketing materials often lack precise and candid information and the source was not authenticated)). Moreover, "[t]he court may take judicial notice at *any* stage of the proceeding." Fed. R. Evid. 201(d) (emphasis added). Thus, the Court may take judicial notice even at this early juncture because the Court is permitted to take judicial notice *sua sponte*, Fed. R. Evid. 201(c)(1), and "the fact is not subject to reasonable dispute," Fed. R. Evid. 201(b).

(outlining specific precautions to be taken by staff members, including the use of personal protective equipment and hand sanitizer); DOM 2020-30R3 (eff. May 27, 2020); DOM 2020-30R4 (eff. Aug. 10, 2020); DOM 2020-30R5 (eff. Aug. 25, 2020); DOM 2020-30R6 (eff. Aug. 27, 2020); DOM 2020-30R7 (eff. Nov. 5, 2020); DOM 2020-30R8 (eff. Nov. 24, 2020); DOM 2021-26 (eff. Jan. 1, 2021); DOM 2021-26R (eff. Jan. 12, 2021); DOM 2021-26R (eff. Jan. 12, 2021); DOM 2021-26R2 (eff. Jan. 21, 2021); DOM 2021-26R3 (eff. Jan. 25, 2021); DOM 2021-26R4 (eff. Mar. 5, 2021); DOM 2021-26R5 (eff. Mar. 19, 2021); DOM 2021-26R6 (eff. Mar. 26, 2021); DOM 2021-26R7 (eff. June 23, 2021); DOM 2021-26R7 (eff. June 23, 2021); DOM 2021-26R8 (eff. Aug. 6, 2021); DOM 2021-26R9 (eff. Aug. 23, 2021); DOM 2021-26R10 (eff. Oct. 11, 2021); DOM 2021-26R11 (eff. Nov. 19, 2021); DOM 2021-26R12 (eff. Dec. 3, 2021); DOM 2022-21R (eff. Jan. 11, 2022); DOM 2022-21R2 (eff. Jan. 14, 2022); DOM 2022-21R3 (eff. Jan. 18, 2022); DOM 2022-21R4 (eff. Jan. 24, 2022); DOM 2022-21R5 (eff. Feb. 9, 2022). The DOMs set forth specific details about protective measures to be taken in all facilities: describing the types of PPE to be worn by staff and when; setting screening criteria for individuals entering facilities; setting social distancing requirements; establishing isolation areas and practices for isolation; setting practices for managing prisoners under investigation for COVID-19; modifying how personal property is managed; setting requirements for jail transfers; outlining communication adjustments and video visitation; upgrading hygiene, health care, and food service policies; setting protocols for COVID-19 testing of prisoners; and making other necessary adjustments to practices to manage the pandemic. Thus, the MDOC—and Defendant Washington specifically—responded to the COVID-19 threat by adopting new policies and adjusting practices.

Clearly, Defendant Washington has taken extensive steps to address the risk of COVID-19 to inmates statewide and at IBC. Indeed, Plaintiff alleges that Defendant Washington issued multiple DOMs, and continued "revising these policies to help prevent the spread of COVID-19 . . . ."[7] (Am. Compl., ECF No. 12, PagID.326.) As noted by the Sixth Circuit in *Wilson*, such actions demonstrate the opposite of a disregard of a serious health risk. *Wilson*, 961 F.3d at 841. Therefore, Plaintiff fails to state an Eighth Amendment claim against Defendant Washington for her failure to prevent a COVID-19 outbreak at IBC.

Moreover, Plaintiff's suggestion that Defendant Washington should have mandated testing for all MDOC staff each day before starting a shift at IBC appears misplaced. Perhaps Plaintiff labors under the false impression that COVID-19 testing kits were readily available. That has not been the case. The nation faced several shortages of testing kits during 2020 and since. *See, e.g.*, GAO, *COVID-19: Urgent Actions Needed to Better Ensure an Effective Federal Response*, https://www.gao.gov/products/gao-21-191 (Nov. 30, 2020) ("In September 2020, GAO reported that ongoing constraints with the availability of certain types of personal protective equipment (PPE) and testing supplies remain due to a supply chain with limited domestic production and high global demand. In October 2020, GAO surveyed public health and emergency management officials from all states . . . and found . . . about one-third to one-half [of states] reported shortages in . . . testing supplies.").[8]

---

[7] Notably, Plaintiff appears also to complain above that Defendant Washington took *excessive* steps to address the risk posed by COVID-19 by limiting time for phone, J-Pay, and prison yard.

[8] Notwithstanding the Court's ability to take judicial notice of these facts under Rule 201 of the Federal Rules of Evidence, the information in this paragraph plays no role in the Court's decision. Instead, this information merely provides context and additional information to a prisoner who is incarcerated amidst an ongoing deadly pandemic. *C.f. United States v. Mathews*, 846 F. App'x 362, 364 n.3 (6th Cir. 2021).

### (2)    IBC dining hall

To the extent that Plaintiff faults Defendant Washington for not closing the IBC dining hall, Plaintiff does not adequately allege that the IBC dining hall in particular posed an excessive risk much less that Defendant Washington knew of and disregarded any such risk. He merely speculates, with the benefit of hindsight, that COVID-19 transmitted between prisoners in the IBC dining hall. He does not allege any facts to demonstrate that Defendant Washington, who oversees the entire MDOC, knew of a particularized risk in the dining hall of one of the dozens of prisons under her supervision. Furthermore, the purported risk was not so obvious as to permit the inference that any MDOC official, much less Defendant Washington, was aware of it at the time. *See Hope*, 536 U.S. at 738. Consequently, Plaintiff fails to allege facts sufficient to satisfy the subjective prong in a claim related to the IBC dining hall. *See Farmer*, 511 U.S. at 837.

### (3)    Shared cells

Plaintiff alleges that Defendant Washington approved of his placement back in his cell for several hours with his cellmate, inmate Steele, after Steele tested positive for COVID-19. Plaintiff further asserts that Defendant Washington placed quarantining prisoners in two-person cells, which made it impossible to socially distance.

Plaintiff's allegations that Defendant Washington approved of his placement back with inmate Steele again fail to demonstrate that Defendant Washington knew of and disregarded a substantial risk to his health or safety. First, Plaintiff does not explain Defendant Washington's suggested personal involvement, as the director of the entire MDOC, in his cell placement immediately after Steele tested positive for COVID-19. Even accepting Plaintiff's incredible allegation that Defendant Washington personally *approved* of his cell placement, Plaintiff has not shown that Defendant Washington *knew* that Steele tested positive for COVID-19 to indicate that

32

she knew of a risk to Plaintiff's health or safety. Plaintiff therefore fails to state an Eighth Amendment claim against Defendant Washington for the time Plaintiff spent waiting to move out of the cell he shared with Steele. *See Farmer*, 511 U.S. at 837.

Moreover, even if Defendant Washington knew that Steele tested positive, Plaintiff has not adequately alleged that Defendant Washington disregarded his health or safety. Plaintiff appears to allege that he shared his cell with Steele for some period prior to Steele testing positive. Steele did not become contagious when he tested positive. Plaintiff alleges that Steele had already experienced symptoms the day that he tested positive. Steele was presumably contagious for hours, perhaps days, before testing positive. *See* CDC, *What We Know About Quarantine and Isolation*, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine-isolation-background.html (Jan. 31, 2022) ("Infectiousness peaks around one day before symptom onset and declines within a week of symptom onset, with an average period of infectiousness and risk of transmission between 2-3 days before and 8 days after symptom onset.").[9] The several additional hours that Plaintiff shared a cell with Steele after Steele tested positive would seem to add only minimal risk to Plaintiff's health or safety. Plaintiff's allegations indicate that he used the information that Steele tested positive to stay near the window and away from Steele.

Plaintiff's claim that after he was in close contact with inmate Steele, he quarantined in a cell with another quarantining prisoner fails for similar reasons. Plaintiff has not demonstrated that Defendant Washington had any knowledge of his cell assignment much less that she approved of it. Indeed, the policies that Defendant Washington issued instructed that quarantining prisoners should not share cells. The operative DOM at the time, DOM 2021-26R3, directed that "[Prisoners

---

[9] As described above, *see supra* note 7, although the Court may take judicial notice of these facts, the information plays no role in the Court's decision.

who are under investigation for having COVID-19] shall be placed *alone* in a cell . . . ." DOM 2021-26R3, at 3 (emphasis added). Because Plaintiff has not adequately alleged that Defendant Washington had knowledge that Plaintiff shared a cell with another quarantining prisoner, Plaintiff cannot demonstrate that Washington knew of and disregarded a substantial risk to Plaintiff. Therefore, Plaintiff may not maintain an Eighth Amendment claim against her for sharing a cell while quarantining. *See Farmer*, 511 U.S. at 837.

### C.      First Amendment

Plaintiff further alleges that Defendant Washington violated his First Amendment rights by retaliating against Plaintiff when she created policies that restricted COVID-positive prisoners' activities while they were ill, purportedly because Plaintiff "attempt[ed] to complain[] to family." (Am. Compl., ECF No. 12, PageID.339.)

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory

motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'"
*Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (finding that, in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial" (internal quotation marks omitted)); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("[B]are allegations of malice on the defendants' parts are not enough to establish retaliation claims" that will survive § 1915A screening (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998))). Plaintiff merely alleges the ultimate fact of retaliation in this action. He has not presented any facts to support his conclusion that Defendant Washington, the director of the entire MDOC, retaliated against him because he complained to his family. Accordingly, his speculative allegation fails to state a claim.

### D.    Supervisory Liability

To the extent that Plaintiff's allegations assert any residual claims against Defendant Washington, those allegations appear rooted in his belief that she failed to properly supervise her subordinates. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act

based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. As fully discussed above, Plaintiff has failed to allege that Defendant Washington engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against her.

<u>Conclusion</u>

The Court will deny Plaintiff's pending motions.

Additionally, pursuant to Rules 18, 20, and 21 of the Federal Rules of Civil Procedure, the Court determines that the Defendants Walzac, McBride, Battle, Stroller, Klien, Robinson, Bennikson, Harrison, Inspector Gibson, Officer Gibson, Burch, Crips, Simon, Muchowski, George, Parish, Unknown Party #1, Unknown Party #2, Strong, and Corning are misjoined in this action. The Court will drop them from this suit, dismissing Plaintiff's claims against them without prejudice. The Court will also dismiss without prejudice Plaintiff's claims against Defendant Macauley other than the retained claim that Macauley interfered with Plaintiff's access to the courts.

Further, having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed with prejudice for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons the Court concludes that Plaintiff's complaint is properly dismissed, the Court also concludes that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court certifies that an appeal would not be taken in good faith.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:   __February 25, 2022__          __/s/ Robert J. Jonker_____
                                        ROBERT J. JONKER
                                        CHIEF UNITED STATES DISTRICT JUDGE